IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff/Respondent,<br><br>vs.<br><br>DUSTY WHITEHOUSE,<br><br>Defendant/Movant. | Cause No. CR 15-147-BLG-SPW<br>CV 19-019-BLG-SPW<br><br>ORDER DENYING § 2255 MOTION<br>AND DENYING CERTIFICATE<br>OF APPEALABILITY |

This case comes before the Court on Defendant/Movant Dusty Whitehouse's

motion to vacate, set aside, or correct her sentence, pursuant to 28 U.S.C. § 2255.

Whitehouse is a federal prisoner proceeding pro se.

## I. Background

On August 17, 2015, Whitehouse and her co-defendant husband Gary Quigg

sold 3.7 grams of methamphetamine to a friend of theirs, Crystal Lopez. Lopez

was wearing a wire. An undercover agent, Agent Ivers, waited in the living room.

Drugs in hand, Lopez returned to the living room and soon departed with Ivers.

But the agent had paid $900. Ivers testified that he expected to receive an ounce,

and Lopez testified that the price for a gram was $100. At any rate, everyone

agreed that $900 should have bought more than 3.7 grams.

1

Two days later, on August 19, Ivers called Quigg. Quigg acknowledged that Ivers had overpaid and invited him to come to the house again. That evening, Ivers spoke with Whitehouse about getting his money back or getting more product. She offered either to refund his money or give him more methamphetamine. She asked Quigg for more methamphetamine, but he did not have any. Whitehouse refunded Ivers $300.

On August 25, Ivers again called Quigg and asked to "swing by and visit." After talking about the weather and what day it was, Quigg said he was "between paychecks" and would "find out when I get home." U.S. Trial Ex. 8. Quigg did not call Ivers back. Neither Whitehouse nor Quigg talked to Ivers again.

All of these transactions were recorded and played for the jury at trial.

Whitehouse was on state probation, and Quigg was on parole. On September 15, 2015, both were arrested on suspicion of violating their conditions of release. A probation officer retrieved a phone from their vehicle and looked at text messages on it. Agents obtained and executed a search warrant at their home. But Whitehouse and Quigg were not charged in federal court at that point.

On October 1, 2015, Charity Mendonsa met a man in Billings at about 11:00 p.m., intending to sell him about eight ounces of methamphetamine. She did sell him the meth, but he too turned out to be an undercover agent, Agent Papke. She was arrested. Agents obtained a search warrant for her pickup truck. Witness

2

Bailey had already told them that Mendonsa brought methamphetamine from California to Montana in a hidden compartment in the tailgate. Agents found the compartment and, in it, two pounds of methamphetamine.

On December 3, 2015, a grand jury indicted Mendonsa, Quigg, and Whitehouse. After Mendonsa pled guilty, a grand jury returned a superseding indictment against Quigg and Whitehouse, charging the following offenses and drug quantities:

Count 1    conspiring to distribute and possess with intent to distribute five hundred (500) grams or more of methamphetamine between December 2014 and September 15, 2015, a violation of 21 U.S.C. § 846;

Count 2    possessing the same with intent to distribute it, a violation of 21 U.S.C. § 841(a)(1); and

Count 3    distributing methamphetamine on August 17, 2015, a violation of 21 U.S.C. § 841(a)(1).

*See* Superseding Indictment (Doc. 91) at 2–3.

Jury trial commenced on January 30, 2017. Mendonsa, Lopez, Bailey, Papke, and Ivers all testified. The jury heard the August 2015 recordings and saw surveillance photographs, photographs from the home search, and text messages retrieved from the phone.

According to Bailey and Agent Martian, in July 2015, Bailey tipped off agents that Mendonsa was going to give Whitehouse whatever methamphetamine she had left on that trip. Agents went to Whitehouse's neighborhood and

3

photographed Mendonsa meeting with her. Mendonsa testified that she and Whitehouse only "used a little" methamphetamine and "went shopping" together on that occasion. *See* 3 Trial Tr. at 364:10–15. But she also testified that, after her husband Kevin died in April 2015, she sold Whitehouse one ounce, and then four ounces—a total of 141.75 grams. In addition, Mendonsa said Quigg called her shortly after Kevin's death to find out whether she was going to deliver $1,800 of methamphetamine Kevin had promised to Quigg. Later, Quigg asked Mendonsa not to front drugs to Whitehouse, because he would end up having to pay for it. *See id.* at 356:5–362:18.

Mendonsa testified that Kevin dealt in large quantities and had about $400,000 in the house when he passed away. The text messages found on the phone taken from Whitehouse and Quigg's car included a query on September 11, 2015, asking Mendonsa when she would be in Billings "so I can get my ducks in a row." Mendonsa responded, "Not sure but ill keep u posted." Trial Ex. 10(B) at 2. This testimony was essential to the drug quantities charged in Counts 1 and 2. In closing, the United States argued that this text was Quigg's way of saying he "wanted a piece of that action" the next time Mendonsa came to Montana. The prosecution urged the jury to hold Whitehouse and Quigg responsible for the methamphetamine found in Mendonsa's tailgate. *See* 5 Trial Tr. (Doc. 206) at 788:11–25.

On February 2, 2017, the jury convicted Whitehouse on all three counts, but it did not find the drug quantities the United States had charged.  It found:

Count 1    conspiring to distribute and possess with intent to distribute fifty (50) grams or more of methamphetamine between December 2014 and September 15, 2015, a violation of 21 U.S.C. § 846;

Count 2    possessing fifty (50) grams or more of methamphetamine with intent to distribute it, a violation of 21 U.S.C. § 841(a)(1); and

Count 3    distributing methamphetamine on August 17, 2015, a violation of 21 U.S.C. § 841(a)(1).

*See* Verdict (Doc. 122) at 1–3.[1]

At sentencing, Whitehouse was held responsible for more than 50 but less than 150 grams of actual methamphetamine—that is, "the controlled substance, itself, contained in [any] mixture or substance."  U.S.S.G. § 2D1.1(c) Drug Quantity Table Note B (Nov. 1, 2016).  With a total adjusted offense level of 30 and a criminal history category of IV, Whitehouse's advisory guideline range was 135 to 168 months.  *See* Statement of Reasons (Doc. 187) § III.  She was sentenced to serve 135 months in prison, consecutive to a state sentence.  She will serve five years on supervised release.  *See* Judgment (Doc. 186) at 2–3.

Whitehouse appealed.  She argued that her sentence should not have been based on actual methamphetamine and that she should have received a downward

---

[1] For perspective, 50 grams is a little less than two ounces.  Five hundred grams is 17.64 ounces, just over one pound.

adjustment for acceptance of responsibility because she did not contest Count 3. The Court of Appeals affirmed her sentence. *See* Mem. (Doc. 217) at 1–3, *United States v. Whitehouse*, No. 17-30139 (9th Cir. Sept. 5, 2018).

Whitehouse timely filed her § 2255 motion on February 11, 2019. *See* Mot. § 2255 (Doc. 226) at 25 Decl. ¶ C; *Houston v. Lack*, 487 U.S. 266, 276 (1988).

The Court required trial counsel to submit affidavits concerning one of Whitehouse's claims. *See* Order (Doc. 245). Counsel complied on November 20, 2019 (Doc. 249). The Court also ordered the United States to file the pretrial discovery concerning seizure and search of the cell phone. *See* Order (Doc. 252); U.S. Resps. (Docs. 258-1, 263-1). Finally, on August 10, 2020, the United States filed the audio recordings that were played for the jury at trial. *See* Order (Doc. 266); U.S. Notice (Doc. 267); *see also* U.S. Exhibit List with Admitted Exhibits (Doc. 131).

## II. Claims and Analysis

A § 2255 motion "should set out substantive facts that will enable the court to see a real possibility of constitutional error. Habeas corpus is not a general form of relief for those who seek to explore their case in search of its existence." *Aubut v. Maine*, 431 F.2d 688, 689 (1st Cir. 1970), *quoted in Calderon v. United States Dist. Court*, 98 F.3d 1102, 1106 (9th Cir. 1996); *see also* Rule 4, Rules Governing § 2254 Cases, Advisory Committee Note para. 3 (1976). A court is not required to

assume the truth of conclusory allegations.  *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).  An evidentiary hearing or further development of the record is necessary only when a § 2255 movant alleges facts that would, if proved true, entitle her to relief.  *See, e.g.*, *United States v. Rodriguez-Vega*, 797 F.3d 781, 791–92 (9th Cir. 2015).

Generally, a claim is defaulted if it arises from a matter that is in the record at the time of direct appeal but is not raised on direct appeal.  *See, e.g.*, *Bousley v. United States*, 523 U.S. 614, 622–24 (1998); *United States v. Frady*, 456 U.S. 152, 165 (1982).  Claims B through I are defaulted.  Rather than extending Whitehouse an opportunity to excuse her default, *see, e.g.*, *Boyd v. Thompson*, 147 F.3d 1124, 1127–28 (9th Cir. 1998), the Court will proceed as if the default were excused and will address all the claims on their merits.

Whitehouse's claims are reorganized here, but all are addressed.

## A. Jurisdiction

Claims that subject-matter jurisdiction was absent *ab initio* cannot be waived or defaulted.  *See, e.g.*, 28 U.S.C. § 2255(a); *United States v. Cotton*, 535 U.S. 625, 630 (2002); *United States v. Ratigan*, 351 F.3d 957, 962 (9th Cir. 2003).

Whitehouse alleges the United States never had authority to charge or try her because the State of Montana has not authorized its agents to involve federal authorities in the investigation or prosecution of crime.  *See* Mot. § 2255 (Doc.

226) at 2–3; Br. in Supp. (Doc. 227) at 1–3.

The Commerce Clause of the United States Constitution gives the United States jurisdiction to regulate and control commerce, including trafficking in controlled substances.  As an attribute of sovereignty, the United States has authority to investigate, prosecute, and sentence persons who violate its laws.  A State's laws do not alter, undermine, or qualify federal sovereignty and supremacy. *See, e.g.*, U.S. Const. art. VI cl. 2; *Gonzalez v. Raich*, 545 U.S. 1, 5, 17–18 (2005).

This Court had jurisdiction because the United States accused Whitehouse of "offenses against the laws of the United States."  18 U.S.C. § 3231.  The State of Montana also could have prosecuted her. *See Gamble v. United States*, __ U.S. __, 139 S. Ct. 1960, 1963–64 (2019).  The reason for and extent of cooperation between state and federal authorities is not relevant to anything at issue here.  This claim is denied.

**B.  Jury Selection Process**

Whitehouse asserts that the process by which jurors and grand jurors are selected is "unconstitutional as there are not a proportunate [proportionate] number of minorities in the jury pool compared to the percentages of the State's population."  Mot. § 2255 (Doc. 226) at 3.  She says her husband and co-defendant told her he had taken a class in which "discriminatory governmental policies and practices were discussed, including problems in voting and lack of representation

8

in matters such as jury pools." *Id.* at 4. She also says her own discussion of the issue with Native Americans reinforced her belief. *See id.*

Alleging that something is true is not a fact supporting a reasonable inference it is true. Whitehouse alleges no fact supporting an inference that the representation of any demographic group in the District of Montana's jury pool is disproportionate to its representation in the general population or that drawing jurors from lists of registered voters and licensed drivers, cross-referenced to eliminate double-counting, systematically excludes any particular group. *See* D. Mont. Jury Plan § IV (Feb. 2015); *United States v. Nakai*, 413 F.3d 1019, 1022 (9th Cir. 2005). Unsupported speculation that "an investigation will demonstrate deliberate discriminatory exclusion of minorities from the database from which jurors have been chosen," Br. in Supp. (Doc. 227) at 5, does not justify further proceedings. Nor would it have supported investigation and motions practice by counsel. This claim, *see* Mot. § 2255 at 3–4; Br. in Supp. at 3–5, is denied.

### C. Cell Phone Seizure and Search

Whitehouse claims her Fourth Amendment right to be free of unreasonable searches and seizures was violated when a probation officer unlocked the car and seized and searched the cell phone she and Quigg shared. Alleged violations of the Fourth Amendment exclusionary rule are not cognizable on collateral review. *See Stone v. Powell*, 428 U.S. 465, 482 (1976). The Court will consider this claim only

9

under the rubric of ineffective assistance of counsel.

**D. Medication**

Whitehouse claims she was unable to concentrate appropriately or to participate fully in trial preparation or trial because the Marshals and detention center staff "tampered with and changed" prescription psychiatric medications. *See* Mot. § 2255 at 5–6; Br. in Supp. at 10.

Whitehouse's first attorney requested and received two continuances to obtain information about her medications and ensure she was able to participate in the case. *See* Docs. 49, 50, 56, 57, 58. That attorney later withdrew, and new counsel was appointed. He did not raise the issue, but Whitehouse personally wrote two motions and a letter to the Court before trial. *See* Docs. 62, 63, 79, 96. They asserted that "oppressive" conditions of confinement were affecting her physical and mental state. They did not mention medication or indicate that Whitehouse was experiencing difficulty concentrating.

About two months after trial, Whitehouse wrote a letter to the Court stating that her medication had been changed before trial. *See* Letter Apr. 19, 2017 (Doc. 150-1)[2]; *see also* Pro Se Mot. for Medication May 26, 2017 (Doc. 162); Letter June 2, 2017 (Doc. 163); Letter June 3, 2017 (Doc. 164). Counsel also sought to continue sentencing for 90 days from June 30, 2017, based in part on Whitehouse's

---

[2] Doc. 150-1 is identical to Doc. 150 but more legible.

advisement about her medication issues. *See* Mot. to Continue (Doc. 168) at 2 ¶ 2; *see also* Def. Sentencing Mem. (Doc. 171) at 12 (Objection 14) (stating that YCDF "inexplicably" replaced Whitehouse's Adderall with amphetamine salt). The motion was denied. *See* Order (Doc. 169). The presentence report shows she received Adderall while she was held at Basin, Wyoming, and amphetamine salt at the Yellowstone County Detention Center. *See* Presentence Report ¶¶ 84, 88.

After trial, Whitehouse said that if she had been able to continue her usual medication, "I would have been able to not waste everyones time going to trial." Letter Apr. 19, 2017 (Doc. 150-1) at 2. But even now, in her § 2255 motion, Whitehouse claims that she wanted to plead guilty only to Count 3. As described below, the United States' plea offer required her to plead guilty to Count 1. And she does not now and never has suggested she was willing to plead guilty to all three counts without a plea agreement.

This claim is denied.

**E. Entrapment**

Whitehouse claims she was not predisposed to distribute methamphetamine and that Crystal Lopez induced her to do so. *See* Mot. § 2255 at 9–10, Br. in Supp. at 18. This claim arises from the controlled buy, involving 3.7 grams of methamphetamine, that took place on August 17, 2015, between Lopez and Agent Ivers, acting undercover, and Whitehouse and Quigg. Whitehouse's statements on

11

the wire with Ivers, when Lopez was not there, *see* Trial Ex. 7, preclude any realistic possibility of an entrapment defense. This claim is denied.

## F. Prescription for Methamphetamine

Whitehouse asserts she lawfully possessed methamphetamine because a physician prescribed her five-milligram Desoxyn pills, i.e., methamphetamine hydrochloride, and she could not afford to fill her prescription at the local pharmacy. She asks rhetorically, "How can Movant be charged and prosecuted for allegedly possessing or attempting to possess the same substance?" Mot. § 2255 at 11.

Whitehouse was not charged or prosecuted for possession or attempted possession. She was charged with and convicted of conspiracy to distribute and possess with intent to distribute, possession with intent to distribute, and distribution. This claim, Mot. § 2255 at 10–11, Br. in Supp. at 19–20, is denied.

## G. Other Acts Evidence

Whitehouse claims she was prejudiced by introduction of evidence about her use and possible trafficking in marijuana, dilaudid, and oxycodone. *See* Mot. § 2255 at 16; Br. in Supp. at 25. An agent testified that some text messages concerned these drugs. *See, e.g.*, 4 Trial Tr. (Doc. 205) at 589:4–589:15. Lopez testified that she bought methamphetamine and oxycodone from Quigg and Whitehouse. *See, e.g.*, 3 Trial Tr. (Doc. 204) at 454:5–455:13. But the jury knew

the defendants were on trial only for the charges in the superseding indictment, meaning methamphetamine. *See* Jury Instrs. (Doc. 127) at 26, 29; 4 Trial Tr. (Doc. 205) at 735:2–735:7, 737:9–738:3; *see also id.* at 606:4–606:8. And prospective jurors were carefully questioned in voir dire about their views of illegal drugs. *See, e.g.*, 2 Trial Tr. (Doc. 203) at 197:4–197:19, 205:25–206:22, 210:2–210:24; 214:22–216:5, 219:15–224:1, 233:13–235:10, 237:5–238:10, 241:4–242:24.

Whitehouse's allegations do not support an inference that specific references to marijuana, dilaudid, and oxycodone "more likely than not affected the verdict" concerning methamphetamine. *See United States v. Schales*, 546 F.3d 965, 976 (9th Cir. 2008) (citing *United States v. Pang*, 362 F.3d 1187, 1192 (9th Cir. 2004)). This claim is denied.

## H. Rule 32

Whitehouse correctly points out that Rule 32(e)(2) requires the probation office to provide a copy of the draft presentence report "to the defendant, the defendant's attorney, and an attorney for the government." Fed. R. Crim. P. 32(e)(2); *see* Mot. § 2255 at 20; Br. in Supp. at 32. In her case, as in probably all other cases in this Court involving an incarcerated defendant, the probation officer gave a copy of the draft report only to counsel. Presentence reports contain intimate and sensitive information about the defendant and many other people that should be protected against disclosure. Nonetheless, withholding the report from

13

an incarcerated defendant is a literal violation of Rule 32.

If Whitehouse identified material information that was omitted from the presentence report, or pointed to erroneous information included in it, she might show prejudice from the Rule 32 violation. But she merely attacks the probation officer who prepared the report. *See* Mot. § 2255 at 19–22; Br. in Supp. at 31. The Court was familiar with the case and the trial testimony and made its own decisions at sentencing. *See, e.g.*, Statement of Reasons (Doc. 187) at 1 §§ I(B)(1), III, 4 § VIII, 5.

This claim, *see* Mot. § 2255 at 19–22; Br. in Supp. at 31–32, is denied.

## I. Purity of Methamphetamine

Whitehouse contends she should not have been sentenced for pure or actual methamphetamine because Mendonsa's trial testimony did not adequately support the purity. *See* Mot. § 2255 at 23–24; Br. in Supp. at 33–34. A DEA chemist's testimony established the identity and purity of the substance. *See* 3 Trial Tr. (Doc. 204) at 316:12–317:23, 324:3–324:22.

Chief Judge Winmill's opinion in *United States v. Castro*, No. 2:17-CR-11-BLW (D. Idaho Mar. 8, 2018), is, as Whitehouse says, "progressive" and "well-reasoned." Mot. § 2255 at 24. But it is not binding, and even if it were, a purity of 98.2% to 100% is at the high end of Judge Winmill's empirical survey of drug purity levels in Idaho in 2015 and 2016.

14

This claim is denied.

## J. Ineffective Assistance of Counsel

Whitehouse alleges counsel was ineffective in various respects.[3] *Strickland v. Washington*, 466 U.S. 668 (1984), sets the standards for claims of ineffective assistance of counsel. At this stage of the proceedings, Whitehouse must allege facts sufficient to support an inference (1) that counsel's performance fell outside the wide range of reasonable professional assistance, *id.* at 687-88, and (2) that there is a reasonable probability that, but for counsel's unprofessional performance, the result of the proceeding would have been different, *id.* at 694. A reasonable probability is less than a preponderance of the evidence. The prejudice standard is met if the Court's confidence in the outcome of the trial is undermined. *See id.* at 693–94; *cf. Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *United States v. Bagley*, 473 U.S. 667, 681–82 (1985).

### 1. Cell Phone Seizure and Search

Whitehouse alleges counsel should have moved to suppress the fruits of a search of the cell phone she shared with Quigg. *See* Mot. § 2255 (Doc. 226) at 4–5; Br. in Supp. (Doc. 227) at 6–9. This claim required expansion of the record.[4]

---

[3] Whitehouse asserts that each of the claims she raises was not raised on direct appeal because she received ineffective assistance of trial and/or appellate counsel. These assertions are conclusory. This section of the Order addresses claims of ineffective assistance that are supported by at least some allegations of fact.

[4] Documents and photographs were filed in the electronic record at the time of trial. *See*

*See* Rule 7, Rules Governing § 2255 Proceedings; Orders (Docs. 245, 248, 252, 255). Viewed in light of the additional materials, the claim lacks merit.

One aspect of the claim contends that Montana law governs the text messages' admissibility and a probation officer cannot conduct a search if his intent is to obtain evidence related to a new crime. *See* Br. in Supp. at 6–7; *see also, e.g., Quigg v. France*, 502 F. Supp. 516, 517–18 (D. Mont. 1980). Federal law controls the admissibility of evidence in federal court. *See, e.g., United States v. Seerden*, 916 F.3d 360, 366 (4th Cir. 2019); *United States v. Chavez-Vernaza*, 844 F.2d 1368, 1374 (9th Cir. 1987). Controlling Fourth Amendment law (and probably state law too, but no matter) does not depend on the officer's motivation. *See Samson v. California*, 547 U.S. 843, 851–54 (2006); *United States v. Knights*, 534 U.S. 112, 116 (2001); *cf. Whren v. United States*, 517 U.S. 806, 813 (1996). Whitehouse does not suggest the officer lacked reasonable suspicion to justify a search. This portion of the claim is denied.

The other aspect of the claim alleges that Probation Officer Evans needed a warrant to search the phone Quigg and Whitehouse shared.

The Court will assume, for the sake of argument, that counsel should have

---

Exs. (Doc. 130, 131, 131-1 through 131-38). Discovery and the recordings played for the jury at trial were not. Whitehouse states that she was not able to listen to the recordings because she would not allow prison staff to listen to them first. *See* Notice (Doc. 268) at 4–5. They were admitted into evidence and played for the jury at trial.

16

filed a motion to suppress the text messages obtained from the phone. Whitehouse has not said what conditions applied to her in terms of search and seizure. But Montana's standard conditions authorized warrantless search, on reasonable suspicion, of a probation's "person, vehicle or residence," Mont. Admin R. 20.7.1101(7) (eff. June 13, 2008) (stating standard conditions), not a phone or even personal effects. It can be argued that the probation officer who retrieved the phone from the vehicle violated the Fourth Amendment by opening it and looking at its recent text messages. *See Riley v. California*, 573 U.S. 373, 393 (2014). The messages he found were not probative of the federal charges, but the record does not establish the legal basis for the extended search of the phone that retrieved the text messages introduced at trial. *See, e.g.*, 1 Trial Tr. (Doc. 202) at 92:6–10.

Even so, the claim fails on the prejudice prong. The relevant text messages corroborated some of Mendonsa's and Lopez's testimony and indicated that whoever was using the phone was willing to engage in buying and selling illegal substances. The phone received texts from "Charity" at a phone number known to be used by Mendonsa. *See, e.g.*, Trial Ex. 10(B) (Doc. 131-19) at 2 (Nos. 43–42). Someone gave Charity's name and number to "Stan K.," *see* Trial Ex. 10(B) (Doc. 131-19) at 3 (No. 87), evidently Stanley Kipp. Kipp was a client at the public defender's office, where Quigg worked, *see* 1 Trial Tr. (Doc. 202) at 84:4–84:17 (discussing Mendonsa's texts), and was also involved in trafficking

17

methamphetamine, *see* 3 Trial Tr. (Doc. 204) at 368:4–371:2; 4 Trial Tr. (Doc. 205) at 597:23–598:10. Lopez testified that she bought methamphetamine and oxycodone from Quigg and Whitehouse, *see* 3 Trial Tr. (Doc. 204) at 454:5–455:13, and texts on the phone discussed OxyContin as well as dilaudid and marijuana, *see, e.g.*, 4 Trial Tr. (Doc. 205) at 685:16–686:9. A reasonable juror could read many of the messages as euphemistic drug talk.

But other evidence corroborated the same central facts. The jury heard the recording of Lopez and Ivers waiting while Whitehouse dealt with another customer. *See, e.g.*, Trial Ex. 3 at 25:35–31:00; 3 Trial Tr. at 458:16–459:13. They heard Whitehouse argue with Quigg about whether she was giving Lopez $900 worth. *See* Trial Ex. 3 at 38:35–41:00; *see also* 3 Trial Tr. at 469:9–470:2. The jury heard Whitehouse, who was trying to come up with three more grams of methamphetamine, ask Quigg whether he had any. They heard him say, "I gave you the last one I had the other night," and they heard Whitehouse object that "that" was her "dope." Trial Ex. 7 at 1:06:15–1:06:50; *see also* 3 Trial Tr. at 514:1–14.

The undercover recordings showed that Whitehouse and Quigg were involved in selling methamphetamine, corroborating Lopez and Ivers' testimony. The recordings also showed that Whitehouse and Quigg had multiple but irregular sources, corroborating Mendonsa's testimony that she supplied them with

18

methamphetamine when she had it.

Attempting to hold Whitehouse responsible for 500 grams or more of methamphetamine, the United States encouraged the jury to attribute to them the 32 ounces (920 grams) of methamphetamine in Mendonsa's tailgate. Had the jury made that finding, a text to Mendonsa on September 11, 2015, would demonstrate a reasonable probability of acquittal but for the texts obtained from the phone. But the jury did not make that finding. Prejudice might also have been shown if Whitehouse and Quigg denied knowing Mendonsa, but they always agreed they knew her and talked to her on the phone.

Perhaps the text messages "sealed the deal," but the Court has no doubt the jury would have arrived at the same verdict without them. This claim, *see* Mot. § 2255 at 4–5; Br. in Supp. at 6–9, is denied.

### 2. United States' Plea Offer

On January 23, 2017, at 11:49 a.m.—one week before trial—the United States emailed a plea offer to Quigg's and to Whitehouse's counsel. The offer was conditioned on both defendants' acceptance. The prosecutor stated that he would seek "the third point" for acceptance of responsibility only if both defendants accepted the offer before the close of business on January 23. Other than that statement, the offer had no expiration date. *See* Plea Offer (Doc. 226-1) at 1.

Whitehouse contends that counsel "did not relay that offer in a timely

19

manner" because she did not have an opportunity to tell Quigg she wanted to accept it before the end of the business day.  She also says she wanted to plead guilty to one charge.  *See* Mot. § 2255 at 6–8; Br. in Supp. at 11–14.

For two reasons, this claim lacks merit.  First, the offer did not expire at the end of the day.  The end of the day would bring only denial of the "third point" for acceptance of responsibility.  Two points for acceptance of responsibility still would have been available if both defendants had accepted.  *See* U.S.S.G. § 3E1.1(a), (b).

Second, the "one charge" Whitehouse claims she wanted to plead guilty to was "the sale involving Crystal Lopez" and 3.7 grams of methamphetamine.  *See* Br. in Supp. (Doc. 227) at 11.  (Elsewhere, Whitehouse alleges she was entrapped by this sale.)  But that was not the offer.  The United States offered to dismiss other charges in exchange for both defendants' guilty plea to a *conspiracy* charge.  As the prosecutor said, the charge "would mirror Count I of the superseding indictment but without [alleging] the drug weight" of 500 or more grams of methamphetamine.  This is why the prosecutor said the penalty range would be "0–20 years of imprisonment (no mandatory minimums)" and "[w]e will then have to argue about the exact drug weight at sentencing."  *See* Plea Offer (Doc. 226-1) at 1 paras. 1, 4; *see also* 21 U.S.C. § 841(b)(1)(A)(viii), (B)(viii), (C).  Had the offer involved only "the sale involving Crystal Lopez," the proffered charge would have

20

"mirrored" Count 3 of the superseding indictment.

Whitehouse's own allegations defeat an inference that she wanted to accept the offer the prosecutor actually made. She wanted to accept an offer the prosecutor did not make. Aside from the fact that Whitehouse's counsel did not have free access to Quigg, *see* Mont. R. Prof'l Conduct 4.2(a) (Mar. 15, 2011); D. Mont. L.R. CR 83.2(a) (Mar. 1, 2016), counsel's failure to take further action when Quigg did not accept the plea offer is readily explained, as Whitehouse did not accept the plea offer either. And provided there is probable cause to charge each defendant, as a grand jury twice found here, a plea offer conditioned on both defendants' acceptance does not violate due process. *See, e.g.*, *United States v. Yong*, 926 F.3d 582, 591–92 (9th Cir. 2017).

This claim is denied.

### 3. Severance

Whitehouse claims counsel should have tried to sever her case from Quigg's so that the United States could not condition its plea offer on their joint acceptance. *See* Br. in Supp. at 14. But severance would not have altered the situation. The law does not limit "package" plea offers to co-defendants in one case. *See, e.g.*, *United States v. Wright*, 43 F.3d 491, 497–500 (10th Cir. 1994), *followed in Yong*, 926 F.3d at 591–94. Whitehouse suggests no other basis for severance, and the charges certainly supported joinder. *See, e.g.*, Fed. R. Crim. P. 8(b). This claim,

21

Mot. § 2255 at 7; Br. in Supp. at 14, is denied.

### 4. Local Rule

Whitehouse says her attorney refused to contest the prosecutor's designation of certain discovery as "sensitive." *See* Mot. § 2255 at 8–9. "Sensitive" discovery contains details about ongoing investigations or personal information or identifiers. It is disclosed to defense counsel and defendants, but the "sensitive" designation means it cannot be left in the defendant's possession. *See* D. Mont. L.R. CR 16.4(a), (b)(1)(D) (Mar. 1, 2016). The rule does not, as Whitehouse claims, *see* Br. in Supp. at 15, "prevent defendants from becoming aware of information" about their cases.

Whitehouse does not identify anything that came out at trial or sentencing of which she was not previously aware or which she did not have an opportunity to parry or refute. She offers no reason to suppose a fact contained within this discovery would prove her innocent. This claim, *see* Mot. § 2255 at 8–9; Br. in Supp. at 15–16, is denied.

### 5. Right to Testify

Whitehouse asserts that she "informed counsel of her desire to both take the stand in her own defense and as a witness for her husband but counsel insisted that she not do so." Mot. § 2255 at 9. She also asserts that she and Quigg would both have been acquitted if she had testified. *Id.* She does not say what she could have

said to acquit them both.

"When a defendant is silent in the face of his attorney's decision not to call him as a witness, he has waived his right to testify." *United States v. Nohara*, 3 F.3d 1239, 1243–44 (9th Cir. 1993) (following *United States v. Edwards*, 897 F.2d 445, 447 (9th Cir. 1990)). The facts Whitehouse alleges demonstrate that she knew she could testify and she followed her attorney's advice not to do so. She does not allege any facts suggesting her attorney's advice was unreasonable. Merely stating that she would have been acquitted if she had testified, without showing how this could be true, does not support an inference that she might be correct. This claim, *see* Mot. § 2255 at 9; Br. in Supp. at 17, is denied.

### 6. Alleged Guilty Plea

Whitehouse claims counsel was ineffective because he made "'testimonial statements' to the jury that Movant had pled guilty to one of the charges when no such plea had actually been entered." Br. in Supp. at 28; *see also id.* at 29.

Counsel did not say Whitehouse pled guilty. He said she "did not dispute" her participation in the sale of 3.7 grams of methamphetamine to Crystal Lopez. *See* 1 Trial Tr. (Doc. 202) at 29:10–25. The buy was recorded, and the United States had already said it would play the recording for the jury. *See id.* at 23:6–24:12. Whitehouse's counsel said, "If Dusty was simply on trial for 3.7 grams, which is the result of that transaction, and in Count Three, we wouldn't be here. . .

23

. [S]he would have pled guilty, accepted responsibility, and moved on." *Id.* at 30:1–7.

Whitehouse even now claims she wanted to plead guilty to Count 3. *See* Br. in Supp. at 11. As there is no reason to suppose she "insisted that [s]he did not engage in the charged act[] and . . . objected to any admission of guilt" on Count 3, *McCoy v. Louisiana*, __ U.S. __, 138 S. Ct. 1500, 1505 (2018), there is no reason to suppose counsel's concession violated her right to choose the objectives of her defense, *see id.* at 1509. Nor does Whitehouse suggest it was unreasonable for counsel to concede Count 3 in order to focus on the more consequential charges in Counts 1 and 2. This claim, Br. in Supp. at 28–29, is denied.

### 7. Lopez Recording

Whitehouse claims that counsel should have sent the recording of the transaction between her and Lopez to a laboratory to clarify the unintelligible portions. *See* Br. in Supp. at 28.

Lopez testified about what was said on the recording. Quigg's counsel swaddled her testimony in evidence of her dishonesty. *See, e.g.*, 3 Trial Tr. (Doc. 204) at 473:23–477:23, 481:20–482:12. Whitehouse's counsel followed up by asking Lopez whether *she* was trying to sell drugs to *Whitehouse*. *See id.* at 486:22–23. In other words, both counsel used the unintelligible portions of the tape to undermine Lopez's credibility.

If Whitehouse's counsel had had the tape analyzed, he probably could not have made the suggestion he made. After all, Whitehouse even now does not claim Lopez actually was trying to sell to her. On the contrary, Whitehouse maintains that she wanted to plead guilty to the Lopez transaction.

There is no reason to suppose Whitehouse told counsel he would find exculpatory evidence on the recording, and its ambiguity served her interests at trial. This claim is denied.

### 8. Pretrial Release

Whitehouse complains of counsel's "failure to requested [sic] pretrial motions for release pending trial and other matters."[5] Her other conclusory allegations here, *see* Mot. § 2255 at 19; Br. in Supp. at 29, are explained a bit in other sections of her motion and brief. The claim about pretrial release is not.

At any rate, hardly any defense lawyer would have thought Whitehouse had a realistic chance at release before trial. Under the charges in the original indictment, she faced a rebuttable presumption against pretrial release for persons indicted for a federal drug crime carrying a 40-year maximum sentence. *See* 18 U.S.C. § 3142(e)(3)(A). And she was a state probationer facing revocation. In addition, the Court sees no reasonable probability that the outcome of the case would have been different if Whitehouse had been released before trial.

---

This claim, to the extent Whitehouse makes it, is denied.

### 9.  Conclusion:  Ineffective Assistance of Counsel

None of Whitehouse's claims of ineffective assistance makes an adequate showing on both prongs of the *Strickland* test to support further proceedings.  They are denied.

### K.  Prosecutorial Misconduct and Related Ineffective Assistance

Whitehouse alleges that the prosecution engaged in misconduct by knowingly presenting false testimony from witnesses Mendonsa, Lopez, Bailey, and Ivers and/or by withholding evidence that would have shown their testimony to be false.  She also claims counsel was ineffective for failing to obtain the evidence that was withheld.  *See* Mot. § 2255 at 11–16, 17–19; Br. in Supp. at 21–24, 26–27.

A prosecutor's knowing use of false evidence to obtain a conviction violates due process.  *See Napue v. Illinois*, 360 U.S. 264 (1959); *Mooney v. Holohan*, 294 U.S. 103 (1935).  Whitehouse must show that the challenged evidence was both material and false, and that the prosecution knew or should have known it was false.  *See Napue*, 360 U.S. at 269–71.  Materiality is established if it is reasonably likely that the evidence could have affected the jury's decision.  *See id.*; *see also United States v. Young*, 17 F.3d 1201, 1203 (9th Cir. 1994) (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)); *United States v. Endicott*, 869 F.2d 452, 455

(9th Cir. 1989). Like prejudice under *Strickland*, a reasonable likelihood is less than a preponderance of the evidence. *See Bagley*, 473 U.S. at 681–82.

### 1. Mendonsa

Whitehouse claims Mendonsa falsely testified that Quigg and Whitehouse called her several times on the day of her husband's funeral, whereas phone records would have shown that Mendonsa called Quigg and Whitehouse several times that day. *See* Mot. § 2255 at 12; Br. in Supp. at 21–23. Whitehouse also claims Mendonsa falsely testified that Quigg and Whitehouse "were buying large quantities of methamphetamine from Kevin," Mendonsa's husband, between December 2014 and Kevin's death in April 2015. During this time period, Kevin and Mendonsa were no longer living together. *See* Mot. § 2255 at 17–18; Br. in Supp. at 26.

The United States sought to persuade the jury to attribute 500 or more grams of methamphetamine to Whitehouse and Quigg. A demonstrative exhibit set out these quantities. *See* 4 Trial Tr. (Doc. 205) at 577:3–580:15; Mot. § 2255 at 18. Agent Martian testified that, based on Mendonsa's testimony, Whitehouse and Quigg received ten ounces each month from November 2014 through March 2015, for a total of 50 ounces, or 1,417.5 grams. *See id.* at 577:8–578:21. And he testified they received a total of about five ounces on one occasion in the spring of 2015 and on July 30, 2015, plus 3.7 grams on August 17, 2015. *See id.* at 579:4–

27

580:7. The overall total shown in the exhibit was about 55 ounces or 1,559 grams.
*See id.* at 580:9–15.

But the jury did not find Whitehouse responsible for 500 or more grams. It
found her responsible for 50 or more grams. *See* Verdict (Doc. 125). Clearly, the
jury was not convinced by Martian's estimates of Kevin's dealings with
Whitehouse and Quigg. The testimony Whitehouse claims was false was not
material to her conviction or to the drug quantity.

Even assuming the evidence Whitehouse discusses might have undermined
Mendonsa's credibility to some extent, the most important testimony she gave—
that she provided methamphetamine to Whitehouse and Quigg—was corroborated
by their own recorded statements on the wire, which indicated they had a source of
supply and wanted to sell methamphetamine. All claims about Mendonsa's
testimony, *see* Mot. § 2255 at 12, 17–18; Br. in Supp. at 21–23, 26, are denied.

### 2. Lopez

Whitehouse claims Lopez testified falsely when she claimed she called
Whitehouse and Quigg on August 17, 2015, asking for $900 worth of
methamphetamine. *See* Mot. § 2255 at 13. The call was not recorded.

Lopez testified that her husband contacted law enforcement to provide
information about Whitehouse and Quigg, but her husband was on probation and
not permitted to have anything to do with undercover operations. Lopez had

bought drugs from them before and agreed to do so on August 17, 2015. *See* 3

Trial Tr. (Doc. 204) at 452:15–455:13 (Lopez). She said she called Quigg to make

sure he was home before she went to the house and also claimed he knew why she

was coming. *See id.* at 457:9–23, 460:13–15 (Lopez), 495:17–19 (Ivers).

Notably, Whitehouse does not claim she has evidence Lopez did not call.

She begins with the proposition that the prosecution would have recorded such an

important call and could have obtained phone records showing it was made, but it

did neither. From those facts, she infers Lopez lied about making the call.

These inferences are not persuasive. Lopez did not testify she had her own

phone and used it. It is at least equally reasonable to infer that she used the phone

in the motel room where she was staying, *see, e.g.*, 3 Trial Tr. (Doc. 204) at

457:11, 471:8 (Lopez), or that she called T.J., and T.J. talked to Quigg—just as

Quigg said he did, *see* 4 Trial Tr. (Doc. 205) at 673:6–674:14. At any rate, after

Lopez left Whitehouse's home with less methamphetamine than she paid for,

Whitehouse's and Quigg's conduct and statements demonstrated they both knew

they owed something, methamphetamine or cash, to Agent Ivers.

Whitehouse's allegations do not support further proceedings. This claim,

Mot. § 2255 at 13, is denied.

### 3. Bailey

Whitehouse alleges the United States must have "coached" its witnesses

because it did not record or at least did not produce recordings of agents'
interviews with them. She also alleges the United States did a poor job of
coaching, because Bailey falsely testified she saw Quigg, who was bald and clean-
shaven, on the "sidewalk" outside the house when in fact Quigg had hair and a
short beard and there was no sidewalk. *See* Mot. § 2255 at 18; Br. in Supp. at 26–
27; *see also* 1 Trial Tr. (Doc. 202) at 146:12–17, 168:21–24, 3 Trial Tr. at 290:18–
23 (sidewalk); 3 Trial Tr. (Doc. 204) at 282:17–283:22 (appearance). According to
Quigg's testimony, there was a sidewalk, *see* 4 Trial Tr. (Doc. 205) at 678:7–15,
707:20–708:23, but he had hair and a beard, *see id.* at 689:13–690:11.

Bailey was not a convincing witness. Defense counsels' cross-examinations
thoroughly undermined her credibility. *See, e.g.*, 3 Trial Tr. at 302:11–305:23.
Her testimony served principally to show how agents discovered a link between
Mendonsa and Whitehouse and Quigg, and it was important only to the extent it
was corroborated by agents. Agent Martian testified that he received a call from
Bailey, who told him Mendonsa was on her way to the home of Whitehouse and
Quigg. He went there and saw Mendonsa in her car with Whitehouse sitting in the
passenger seat. *See* 1 Trial Tr. (Doc. 202) at 39:10–22, 41:23–45:23; Trial Exs.
Gov't 1, 2 (Docs. 131-1, 131-2) (showing Mendonsa's car). Bailey also told
agents Mendonsa concealed methamphetamine in the tailgate of her pickup, and
that is where they found it.

Whitehouse's allegations add nothing the jury did not hear and consider. This claim, Mot. § 2255 at 18, is denied.

### 4. Ivers

Whitehouse contends that Agent Ivers "accidently told the truth" when he said he and Agent Martian "provided her with a wire and — or an electronic recording device and $900 in cash to make the purchase." Mot. § 2255 at 14 (quoting 3 Trial Tr. (Doc. 204) at 495:7–9). The prosecutor's follow-up question was "So, did you initially just let her know that you were going to have 900 available and you kept that? Or did you actually give it to her?" Ivers responded, "No. I'm sorry. I kept that. It was just for her knowledge that she knew that she had access to the $900." 3 Trial Tr. at 495:11–15.

Whitehouse also contends that Ivers falsely testified that he made numerous calls to Quigg after August 17 but only two were answered. Whitehouse claims Ivers made and recorded an exculpatory call in which Quigg said only, "We are not interested in any amount at any price." She claims this call was recorded but suppressed by the prosecution. *See* Mot. § 2255 at 15.

These allegations do not add to or subtract from testimony the jury heard and considered at trial. *See* 3 Trial Tr. at 495:7–15 (Ivers re: $900); 4 Trial Tr. (Doc. 205) at 679:4–684:15 (Quigg re: calls from Ivers). All claims concerning Agent Ivers' testimony, *see* Mot. § 2255 at 14–15, are denied.

### III. Other Motions

Whitehouse moves the Court to authorize discovery, expand the record, and appoint an investigator. *See* Docs. 226-2, 226-3, 226-4. These requests are aimed at obtaining the information the Court has found immaterial to Whitehouse's conviction and sentence. All are denied.

Quigg claims Whitehouse instructed him to a sign another motion on her behalf. *See* Mot. to Clarify (Doc. 269) at 2. Quigg is not a member of the Bar of this Court and may not sign anything on behalf of anyone else. *See* 28 U.S.C. § 1654. The motion will not be considered as to Whitehouse.

### IV. Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules Governing § 2255 Proceedings. A COA should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)); *see also Buck v. Davis*, __ U.S. __, 137 S. Ct. 759, 773–74 (2017).

Whitehouse's claims do not meet the standard. The United States had

jurisdiction to try her for violations of federal law, with or without state participation or approval.  Whitehouse offers no reason to suppose a jury pool composed of lists of registered voters and licensed drivers, cross-referenced to eliminate double-counting, systematically excludes anyone.  The record refutes Whitehouse's claim that changes to her medications affected her at trial.  Her statements on the wire to Agent Ivers precluded a realistic entrapment defense.  A prescription for methamphetamine neither explains nor excuses distribution.  Voir dire and limiting instructions confined the jury's use of other acts evidence.

Whitehouse fails to identify any information she was unaware of and lacked an opportunity to contest in the presentence report.  She overlooks the chemist's testimony about the purity of the methamphetamine sold to Lopez.

Whitehouse's claims of ineffective assistance of counsel are unpersuasive. She claims she wanted to plead guilty, but she wanted to confine her plea to Count 3, and the prosecution only offered a plea to Count 1.  She identifies no realistic basis for severing her trial from Quigg's, identifies no "sensitive" discovery she was unable to contest, and admits following her attorney's advice not to testify. Counsel's opening statement did not say anything about Whitehouse having pled guilty, and Whitehouse does not say she gave counsel any reason to believe clarifying the Lopez tape would be more helpful than its occasional unintelligibility.  Pretrial release was unrealistic for a state probationer in a

presumption case under 18 U.S.C. § 3142.

Whitehouse's claims of prosecutorial misconduct are similarly misguided. Given her statements on the wire, the difficult question for the jury involved drug quantity, and that question was resolved largely in her favor. The "missing" evidence she discusses concerns minor matters unlikely to influence the verdict.

Whitehouse does not identify any fact she did not have a fair opportunity to contest at trial or sentencing. Nor does she identify any fact that could have resulted in a lesser sentence or that might have led to her acquittal. None of her claims makes a showing of any substance that she was deprived of a constitutional right. A COA is not warranted.

Accordingly, IT IS ORDERED:

1. Whitehouse's motion to vacate, set aside, or correct the sentence under 28 U.S.C. § 2255 (Doc. 226) is DENIED.

2. Whitehouse's motions for discovery, expansion of the record, and appointment of an investigator (Docs. 226-2, 226-3, 226-4) are DENIED.

3. The motion to clarify (Doc. 269) is STRICKEN as to Whitehouse and will not be considered as she did not sign it.

4. A certificate of appealability is DENIED. The Clerk of Court shall immediately process the appeal if Whitehouse files a Notice of Appeal.

5. The Clerk of Court shall ensure that all pending motions in this case and

in CV 19-19-BLG-SPW are terminated and shall close the civil file by entering

judgment in favor of the United States and against Whitehouse.

DATED this 27th day of January, 2021.

Susan P. Watters
United States District Court